**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROSA LOPEZ DELGADO, a/k/a Rosa Frutos,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 3963** |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Rosa Lopez Delgado ("Delgado"), also known as Rosa Frutos, seeks judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.[1] Delgado has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking a judgement reversing or remanding the Commissioner's final decision. The Commissioner has filed a cross motion for summary judgment, requesting that we affirm his final decision. For the reasons set forth below, Delgado's motion for summary judgment is denied [dkt. 19] and the Commissioner's motion for summary judgment is granted [dkt. 22].

**I.      Procedural History**

On March 28, 2005, Delgado filed an application for DIB, alleging that she had been disabled since August 1, 2004.[2] Delgado sought DIB on the basis of chronic neck and back pain and

---

[1] 42 U.S.C. § 405(g).
[2] R. at 64.

"intestine problems."[3] That claim was denied on May 27, 2005.[4] Delgado then filed a Request for Reconsideration and the claim was again denied by notice dated November 9, 2005.[5] Thereafter, Delgado filed a request for a hearing before an Administrative Law Judge ("ALJ").[6]

On October 3, 2007, an administrative hearing was held before ALJ Beverly Susler Parkhurst in Chicago, Illinois.[7] At that hearing, ALJ Parkhurst ordered that a consultative examination was needed before a disability determination could be reached.[8] On March 10, 2008, after the consultative examination was conducted, a second hearing was held before ALJ Parkhurst.[9] At the second hearing, Delgado amended her disability onset date to January 1, 2005 because of reported income from 2004.[10] Following the hearing, the ALJ issued an unfavorable opinion on June 27, 2008, finding that Delgado was not disabled under the Social Security Act.[11] Delgado then filed a request for review of the ALJ's determination with the Social Security Administration's Appeals Council on July 29, 2008.[12] On April 26, 2010, the Appeals Council denied the request for review, making the ALJ's June 27, 2008 decision the final administrative determination of the Commissioner.[13] On June 25, 2010, Delgado filed this action.[14]

---

[3]R. at 143.
[4]R. at 64.
[5]R. at 63.
[6]R. at 37, 98.
[7]R. at 538-59.
[8]R. at 548-49.
[9]R. at 560-622.
[10]R. at 24, 573.
[11]R. at 24-36.
[12]R. 17.
[13]R. at 5-7.
[14]*See* Comp. [dkt 1].

## II.     Factual Background

Delgado was forty-eight years old at the time of the administrative hearing and resided with her adult daughter and twelve year old granddaughter.[15] She attended fourteen years of school (including two years of college) and worked various jobs prior to filing for DIB.[16] Her most recent job was at an automotive assembly plant.[17] Other jobs included working as a machine operator at a card printing company and as a cashier at a Spanish speaking grocery store.[18] She also spent time working as a teacher's assistant, grading math papers.[19]

On December 30, 2002, after punching-in at the automotive assembly plant, Delgado walked outside to get a cup of coffee from a food vendor.[20] While walking through the parking lot, she slipped on some ice and fell on her back, striking her head.[21] She missed about three months of work due to the fall but was eventually cleared by doctors and physical therapists to return to work.[22] However, upon returning to the automotive assemble plant she was soon fired because, according to Delgado, her injuries prevented her from completing her duties.[23] The injuries, Delgado said, also prevented her from finding another job.[24] Delgado then filed for DIB. In her application, she alleged that she could not work primarily  because of neck and back pain that resulted from the slip and fall, but she also alleged that she suffered from "intestine problems," which doctors later diagnosed as stomach ulcers.[25] The record consists of a variety of medical documents and testimony

---

[15]R. at 564.
[16]*Id.*
[17]*Id.*
[18]*Id.*
[19]R. at 564, 611.
[20]R. at 27, 202, 564.
[21]R. at 202.
[22]R.  at 121.
[23]R. at 571, 574, 577.
[24]R. at 577, 578.
[25]R. at 143, 202, 397.

from a medical expert, a vocational expert, and Delgado.  We will discuss each of these pieces of evidence in turn.

### A.    Medical Evidence Following Delgado's Accident

Following her accident on December 30, 2002, Delgado attended a number of medical examinations. Each of her treaters are outlined below.

*1. Dr. Perez*

Delgado was examined at Centros Medicos Hispano-Americano ("Centros Medicos") by Chiropractor Fernando Perez, D.C. initially on January 15, 2003.[26]         Dr. Perez noted that Deglado began physical therapy twice a week but was experiencing serious pain.[27]  On one day, the pain was so intense that she went to St. Anthony Hospital, where she was prescribed pain medication and told not to work.[28]  Dr. Perez noted that Delgado complained of pain extending from her neck "into the bilateral buttock area and posterior thighs up to the knees."[29]  Delgado described the neck pain to Dr. Perez as an intermittent dull achy pain and rated the intensity as a seven out of ten.[30]  The pain in her neck was aggravated by bending backward and the pain radiated to her right should.[31] She described her mid back pain similarly, with an intensity rating at six of ten.[32]  Lateral bending intensified the mid back pain.[33]  Her low back pain was also an intermittent dull pain, with an

---

[26]R. at 202-204.
[27]R. at 202.
[28]*Id.*
[29]*Id.*
[30]*Id.*
[31]*Id.*
[32]*Id.*
[33]R. at 202.

intensity of four out of ten.[34]  When she bent forward, her lower back pain was further aggravated.[35]

Dr. Perez made a number of treatment recommendations and placed Delgado on "Temporary Disability for approximately 1 week."[36]

On January 22, 2003 Delgado returned to Centros Medicos and was again examined by Dr. Perez.[37]  Total temporary disability was continued based on Dr. Perez's examination.[38]  Similarly, Delgado met with Dr. Perez on January 30, 2003 and February 26, 2003, and Dr. Perez extended temporary disability on both occasions.[39]  On March 26, 2003, Delgado met with Dr. Perez once again.[40]  Dr. Perez noted that Delgado had full range of motion and was pain free.[41]  He further stated that Delgado had returned to work with restrictions.[42]  On May 7, 2003, Dr. Perez wrote that Delgado was "to continue on light duty restrictions."[43]  Dr. Perez indicated that Delgado could return to "full work duty" on June 30, 2003.[44]

*2. Dr. Segura*

In addition to seeing Dr. Perez, Delgado saw Roberto Segura, M.D.of Centro Medicos for a neurological consultation on January 20, 2003.[45]  He indicated that Delgado complained of intermittent lower back pain.[46]  Delgado complained that the pain became "noted" after  prolonged

---

[34]*Id.*
[35]*Id.*
[36]R. at 204.
[37]R. at 205.
[38]*Id.*
[39]R. at 206, 210.
[40]R. at 212.
[41]*Id.*
[42]*Id.*
[43]R. at 213.
[44]R. at 261.
[45]R. at 243.
[46]*Id.*

standing or sitting.[47]  Dr. Segura found tenderness over the lumbosacral spine and that range of motion was limited to twenty-five degrees in extension.[48]  Nevertheless, Dr. Segura noted that Delgado had a normal stance and gait.[49]  In his impressions, Dr. Segura wrote that Delgado had post-traumatic lumbar syndrome and potentially right lumbar radiculopathy.[50]  On February 17, 2003, Dr. Segura reexamined Delgado and noted that she was "much better."[51]  He also wrote that Delgado had full lumbosacral range of motion and that Delgado "should be able to return to work in the near future."[52]

*3. Physical Therapy*

Prior to filing for disability, Delgado also attended physical therapy sessions to treat her injuries.[53]  On May 21, 2003, a "Physical Therapy Reevaluation Report" completed by Luis Maldonado, P.T. stated that Delgado had attended thirty-five physical therapy sessions.[54]  He noted, "[a]ctive range of motion of the lumbar spine is within normal limits for all planes of movement."[55]  Therapist Maldonado concluded that, "[a]t this time, patient has achieved all goals that were set forth in initial evaluation and will be discharged from physical therapy.  Patient has returned to full work duties."[56]

---

[47]*Id.*
[48]*Id.*
[49]*Id.*
[50]*Id; see* J.E. Schmidt, 3-L Attorneys' Dictionary of Medicine at L-69495(Matthew Bender & Co.2009)(explaining that lumbar, "[p]ertain[s] to the loins, the region of the body which lies between the lower ribs and the upper edge of the hip bones, especially the sides and back of this area. Medically, the word lumbar refers chiefly to the back of this part of the body, and even more frequently to the spine of this area; *i.e.*, the spine lying in the lumbar region and composed of the five lumbar vertebrae.").
[51]R. at 244.
[52]*Id.*
[53]R. at 215-226.
[54]R. at 217.
[55]*Id.*
[56]*Id.*

As a result of missing work from December 30, 2002 to March 23, 2003, Delgado received a workers compensation settlement of $10,000.[57]

## B.    Medical Evidence After Filing for DIB

Despite the several assessments that she could return to full work duty, Delgado filed for DIB on March 28, 2005.[58] On May 11, 2005, Sonya Chen, M.D. completed an Internal Medicine Consultative Examination for the Bureau of Disability Determination Services.[59] Dr. Chen spent forty minutes with Delgado, obtained her medical history, and performed an examination.[60] Delgado's primary complaint was, "[b]ack and neck pain and history of stomach ulcers."[61] She told Dr. Chen that the neck pain radiated to her left arm.[62] Delgado also explained to Dr. Chen that she had problems lifting her left arm and had difficulty with fine motor activities, like opening and closing jars.[63] Further, Delgado stated that her left arm was weak and that she experienced numbness in her left hand.[64] She also told Dr. Chen that she is unable to sit for more than thirty minutes, stand for more than thirty minutes, and she cannot walk more than half of a block.[65] To alleviate her pain, Delgado stated that she took Methocarbamol.[66]

Dr. Chen observed that Delgado was stout and obese and that she had mild discomfort due to her left arm pain.[67] Dr. Chen reported that Delgado was able to walk with a normal gait for a

---

[57]R. at 122-24.
[58]R. at 64.
[59]R at 396-401.
[60]R. at 396.
[61]*Id.*
[62]R. at 396-97.
[63]R. at 396.
[64]R. at 396-97.
[65]R. at 397.
[66]R. at 396
[67]R. at 397.

distance of fifty feet.[68] Delgado also successfully squatted and rose.[69] Delgado "could perform heel toe walking and tandem walking without any difficulty."[70] Dr. Chen also noted that Delgado had no trouble getting on and off the examination table.[71]

Dr. Chen further observed "diffuse tenderness over palpation of the upper trapezius as well as paraspinal neck muscles."[72] The trapezius refers to "[a] large muscle of the upper part of the back."[73] Additional diffuse tenderness was observed at the left shoulder.[74] Delgado's cranial nerves were intact and normal, and cerebellar testing was normal.[75] Strength was decreased in Delgado's upper left extremity, but strength in the upper right and lower extremities was normal.[76] Delgado was able to make a fist with her left hand, but grip strength was diminished due to pain.[77] Delgado also had decreased sensation to light touch and temperature on parts of her left hand.[78] Further, when asked to use her left hand take a piece of paper from Dr. Chen's hand, Delgado "slowly picked up" the piece of paper.[79] Examination of her right hand was normal.[80]

Dr. Chen listed three problems in her clinical impression.[81] First, Dr. Chen found chronic neck pain, which likely resulted from muscle spasms and "possible cervical nerve root

---

[68]*Id.*
[69]*Id*
[70]*Id.*
[71]*Id.*
[72]R. at 399.
[73]J.E. Schmidt, 5-T Attorneys' Dictionary of Medicine at L-117865(Matthew Bender & Co.2009).
[74]R. at 399.
[75]*Id.*
[76]*Id.*
[77]*Id.*
[78]*Id.*
[79]*Id.*
[80]*Id.*
[81]*Id.*

impingement."[82]   However, Dr. Chen's examination did not reveal the "classic distribution" of symptoms.[83]   To develop this further, a magnetic resonance imaging ("MRI") test was completed, but it yielded normal results.[84]   Second,   Dr. Chen diagnosed dyspepsia, another term for indigestion,[85] and a history of peptic ulcer disease.[86]   Third, Dr. Chen concluded that Delgado suffered from obesity.[87]

Following Dr. Chen's examination, medical consultant Jimenez Frank, M.D. completed a Physical Residual Functional Capacity Assessment on May 26, 2005.[88] Dr. Frank did not examine Delgado but drew conclusions about her physical capabilities based on the available medical records.[89]   Dr. Frank concluded that Delgado could occasionally lift and/or carry no more than twenty pounds, that she could frequently lift and/or carry ten pounds, that she could stand and/or walk for a total of about six hours in an eight hour workday, that she could sit for a total of about six hours in an eight hour workday, and that her ability to push and or pull was otherwise unlimited.[90]   Dr. Frank also concluded that Delgado would not be able to climb a ladder, rope, or scaffold and that Delgado would be occasionally limited reaching to the left.[91]   In all other categories of the assessment, Dr. Frank found no limitations.[92]

---

[82]*Id.*
[83]*Id.*
[84]R. at 400, 406.
[85]J.E. Schmidt, 2-D Attorneys' Dictionary of Medicine at D-37106 (Matthew Bender & Co.2009).
[86]R. at 400
[87]*Id.*
[88]R. at 407-414.
[89]R. at 407.
[90]R. at 408.
[91]R. at 409-10.
[92]R. at 407-414.

After Dr. Frank's assessment, on May 27, 2005, disability examiner David Yonan completed a disability determination and transmittal form on behalf of the Social Security Administration.[93] According to that document, Delgado's primary diagnosis was chronic neck pain and her secondary diagnosis was obesity.[94] However, Mr. Yonan determined that Delgado was not disabled.[95] That initial disability determination was then affirmed on November 9, 2005 by disability examiner Richard Horner.[96]

In addition to the medical examinations noted above, a number of diagnostic studies were done as well. On April 25, 2005, Delgado underwent an x-ray exam of her cervical spine and left shoulder.[97] The x-rays showed decreased cervical lordosis.[98] Lordosis is "[a]n abnormal bending or curving of the spine in which the bulge or convexity is forward."[99] The x-ray exam also showed a potential fracture of the C5 spinal process.[100] The x-ray report did not yield any other abnormal results.[101] On September 19, 2005 a second MRI was performed and showed a deformity of the C5 spinal process, which is consistent with an old fracture.[102] However, there was no evidence of central canal stenosis, which is a narrowing of the spinal canal,[103] or cord compression.[104] On March 7, 2006 an electromyography ("EMG") was conducted in an attempt to resolve Delgado's left arm

---

[93]R. at 64.
[94]*Id.*
[95]*Id.*
[96]R. at 63.
[97]R. at 460-61.
[98]R. at 460
[99]J.E. Schmidt, 3-L Attorneys' Dictionary of Medicine at L-69202 (Matthew Bender & Co.2009).
[100]R. at 460.
[101]R. at 460-61.
[102]R. at 416.
[103]J.E. Schmidt, 5-S Attorneys' Dictionary of Medicine at S-108246 (Matthew Bender & Co.2009).
[104]R. at 416.

pain.[105]   An EMG is "[t]he recording of electrical activity generated in muscle for diagnostic purposes."[106]   Delgado's EMG was unremarkable.[107]

On March 28, 2006, Ghanism Kassir, M.D. completed a "Report of Incapacity" for the Department of Human Services.[108]   Dr. Kassir performed a personal examination and drew conclusions regarding Delgado's physical capabilities.   During the examination, Dr. Kassir noted that Delgado's left shoulder joint was limited to seventy degrees.[109]   He diagnosed Delgado with musculoskeletal left shoulder pain with left cervical radiculopathy, a left shoulder rotator cuff tear, and a history of fracture of the sixth and seventh cervical vertebrae.[110] Delgado's walking, standing, sitting, turning, speaking, traveling, finger dexterity, gross manipulation, and fine manipulation abilities were all rated as "full capacity" by Dr. Kassir.[111]   Bending, stooping, climbing, pushing, and pulling abilities were rated as "up to 20% reduced capacity."[112]   Dr. Kassir determined that Delgado had a "full capacity" ability to perform physical activities of daily living. [113]   In an eight hour work day, 5 days per week, Dr. Kassir opined that Delgado could repeatedly lift up to ten pounds.[114]

In August and September 2006, Delgado attended physical therapy at Stroger Hospital because she had recurring cervical pain.[115]   In a physical therapy questionnaire that Delgado filled out, Delgado stated that she could not stand more than an hour.[116]   In addition, she rated her pain as

---

[105]R. at 456-57.
[106]Stedman's Medical Dictionary 126730 (27th ed.2000).
[107]R. at 456.
[108]R. at 437-440, 27.
[109]R. at 439.
[110]R. at 440.
[111]R. at 437.
[112]*Id.*
[113]*Id.*
[114]*Id.*
[115]R. at 467.
[116]R. at 464.

an eight out of ten, adding that it occurs everyday.[117]  Delgado also stated that her pain was made worse with movement, but marked on the form that it was relieved by sitting or lying down.[118] On the questionnaire, Delgado indicated that she was unemployed.  Delgado then responded to the question, "[i]s your current work situation related to this medical problem," by marking "[n]o."[119] The form also asked Delgado whether she had any difficulty completing the following nine activities: job activities; housework; grooming; bathing; dressing; walking; stairs; lifting; and sleeping.[120]  Delgado indicated that she had no trouble completing any of these activities and in the line labeled "other" she wrote, "no problems."[121]  Upon evaluation, the physical therapist noted that Delgado had limited range of motion in her shoulders and upper extremities.[122]

## C.      First Administrative Hearing

On October 3, 2007, Delgado appeared before ALJ Parkhurst for the administrative hearing. Delgado had obtained representation from the Chicago Legal Clinic.[123]  While the representative from the Chicago Legal Clinic was not a licensed attorney, she was permitted to represent Delgado

---

[117]*Id.*
[118]R. at 464.
[119]*Id.*
[120]*Id.*
[121]*Id.*
[122]*Id.*
[123]R. at 538-40.

pursuant to Illinois Supreme Court Rule 711.[124]  Also present at the hearing was medical expert Julian Freeman, M.D ("ME").[125]

Initially, the ALJ indicated that she did not want to proceed with the hearing because she believed that the case was fairly complicated and wanted Delgado represented by a fully licensed attorney or, at least, have the supervising attorney present for the hearing.[126]  However, a hearing did proceed to some extent.[127]  After asking Delgado's representative the theory under which Delgado qualified for DIB, the ALJ asked the ME's opinion.[128]  The ME stated that the medical findings did not provide a basis for any limitations of walking, standing, or sitting.[129]  However, the ME did note that Dr. Chen's opinion "describes fairly severe left upper extremity root, nerve root compromise..."[130]  According to the ME, this consultive opinion by Dr. Chen conflicted with all of Delgado's other  physicians.[131]  To resolve this apparent conflict, the ALJ determined that an additional consultative examination, specifically a neurological exam, would be beneficial to determine the extent and nature of Delgado's complaints.[132]  Upon completion of that exam, ALJ Parkhurst would conduct a second administrative hearing.

### D.    Neurological Consultive Examination

---

[124]R. at 540; *See* Ill. Sup. Ct. R. 711.
[125]R. at 540.
[126]R. at 541-42.
[127]R. at 540-559.
[128]R. at 542-44.
[129]R. at 545.
[130]R. at 545.
[131]R. at 545-46.
[132]R. at 549.

At the request of the ALJ, neurologist Galina Simkin, M.D. performed a neurological consultation on November 19, 2007.[133] Delgado explained to Dr. Simkin that she had neck pain radiating to both shoulders, intermittent burning sensation involving the cervicobrachial area[134] bilaterally, low back pain, and difficulty walking for prolonged periods of time.[135] A Tinel's sign test, which is a test used to diagnose carpel tunnel syndrome, "was positive bilaterally," and Dr. Simkin noted in her results that there was "possible carpal tunnel syndrome."[136]

As part of that consultation, Dr. Simkin completed a form that assessed Delgado's physical capabilities. First, the form required Dr. Simkin to indicate how often Delgado could lift and carry various weights.[137] The form divided weights into four categories: up to ten pounds; eleven to twenty pounds; twenty-one to fifty pounds; and fifty-one to one-hundred pounds.[138] Dr. Simkin was required to check either never, occasionally, frequently, or continuously to indicate how often Delgado could lift weights in each of the four ranges.[139] Dr. Simkin checked "occasionally" for the weight categories of up to ten pounds, eleven to twenty pounds, and twenty-one to fifty pounds.[140] He marked "never" for weights ranging between fifty one and one-hundred pounds.[141] Dr. Simkin also needed to determine how often Delgado could carry items in these same weight ranges. Dr. Simkin determined that Delgado could carry weights up to ten pounds and eleven to twenty pounds

---

[133]R. at 512.
[134]The cervicobrachial area refers to the neck and arm area.  Stedman's Medical Dictionary 126730 (27th ed.2000).
[135]R. at 512.
[136]R. at 512; Attorneys Medical Deskbook § 24:15 (4th).
[137]R. at 513.
[138]*Id.*
[139]*Id.*
[140]*Id.*
[141]*Id.*

"occasionally."[142]  Dr.  Simkin marked that Delgado could "never" carry anything in the weight ranges of twenty-one to fifty pounds or fifty-one to one-hundred pounds.[143]

Second, the form required Dr. Simkin to indicate Delgado's stamina.  Specifically, the form required Dr. Simkin to mark a box indicating how long, at one time without interruption, Delgado could sit, stand, and walk.[144]  He checked the five hour box for sitting, the four hour box for standing and the one hour box for walking.[145]  The form then asked how long Delgado could do these same activities during an eight-hour work day.[146]  Dr. Simkin indicated that Delgado could sit for six hours, stand for four hours, and walk for two hours in an eight-hour work day.[147]

Third, the form required Dr. Simkin to opine on Delgado's ability to use her hands and feet. With regard to her hands, the form listed the following six activities: reaching (overhead); reaching (all other); handling; fingering; feeling; and push pull.[148]  For each hand Dr. Simkin had to indicate how often Delgado could do these activities, either never, occasionally, frequently, or continuously.[149]  Dr. Simkin marked "frequently" for all activities and both hands.[150]  Dr. Simkin also marked "frequently" for left and right "operation of foot controls."[151]

Forth, the form sought information regarding Delgado's ability to tolerate and/or complete various activities.  With regard to postural activities, it required Dr. Simkin to indicate how often

---

[142]*Id.*
[143]*Id.*.
[144]R. at 514.
[145]R. at 514.
[146]*Id.*
[147]*Id.*
[148]R. at 515.
[149]*Id.*
[150]*Id.*
[151]*Id.*

Delgado could perform the following seven activities: climb stairs and ramps; climb ladders or scaffolds; balance; stoop; kneel; crouch; and crawl.[152] The form again presented the frequency options of never, occasionally, frequently, and continuously for each activity.[153] According to Dr. Simkin, she could "occasionally" complete all of these activities.[154] In terms of how often Delgado could tolerate different environmental limitations, the form listed eight activities: unprotected heights; moving mechanical parts; operating a motor vehicle; humidity and wetness; dust, odors, fumes and pulmonary irritants; extreme cold; extreme heat; vibrations; and "other."[155] Dr. Simkin marked "occasionally" for all these activities.[156] Finally, the form asked whether or not Delgado could complete the following nine activities: shopping; traveling without a companion for assistance; ambulating without using a wheelchair or other device; walking a block at a reasonable pace on rough or uneven surfaces; using public transportation; climbing a few steps at a reasonable pace with the use of a single hand rail; preparing a meal and feeding herself; and handling papers/files.[157] Dr. Simkin checked "yes" for all of these activities.

### E.      Second Administrative Hearing

With the neurological consultive exam complete, Delgado returned with a licensed attorney from the Chicago Legal Clinic, for a second administrative hearing before ALJ Parkhurst.[158] Also

---

[152]R. at 516.
[153]Id.
[154]Id.
[155]R. at 517.
[156]Id.
[157]R. at 518.
[158]R. at 560-622.

present at the hearing was the same neurologist ME that appeared at the first hearing, a vocational expert, and two Spanish interpreters.[159]

First, Delgado's representative gave an opening statement, describing Delgado generally and the nature of her injury.[160] As part of that statement, the representative stated that Delgado had "limited ability to communicate in the English language."[161] However, the ALJ was able to ascertain that Delgado successfully completed both the United States citizenship exam and a drivers license test in English.[162]

Delgado then provided testimony through the aid of an interpreter. She explained that at the time she was injured, she was working for an automotive company as an assembler.[163] As part of the job, she was required to assemble "3,000 pieces per day."[164] Delgado testified that after she was injured and completed physical therapy, she returned to work for a short period of time.[165] However, Delgado stated that she was "laid off because [she] couldn't work."[166] Delgado explained that she was unable to work because she was unable to hold her body up for more than an hour, and could not maintain the required assembly pace.[167] Delgado also mentioned that she was unable to sit for prolonged periods of time.[168] The ALJ seemed to doubt the severity of Delgado's complaints,

---

[159]R. at 562.
[160]R. at 563-66.
[161]R. at 566.
[162]R. at 566-67.
[163]R. at 576.
[164]*Id.*
[165]R. at 570-71.
[166]R. at 571, 577.
[167]R. at 574.
[168]*Id.*

however, and noted for the record that, at the hearing, Delgado was able to stand up and sit down quickly and with relative ease.[169]

After losing her position at the automotive assembly plant, instead of looking for other work, Delgado invested her savings into an insurance selling business.[170] She stated that although she invested the money and reported some earnings from the investment, she did not do any work in the business.[171] Instead, she stated that her children did all the work.[172] However, later, when the vocational expert asked, Delgado conceded that she maintained an office at the insurance business.[173]

The ALJ then asked Delgado to describe her typical day.[174] Delgado stated that she wakes up at nine in the morning, makes breakfast, and then lies back down for two to three more hours.[175] Delgado testified that she then takes a shower, combs her own hair, and dresses herself.[176] She makes lunch and then resumes lying down.[177] Delgado said that she remains lying down until she goes to sleep around eight or nine at night.[178] Despite her pain, she stated that she is able to fall asleep at night.[179] Delgado added that she has difficulty using the computer because she cannot sit for very long.[180] When asked, Delgado said that she "almost never" goes grocery shopping.[181] She

---

[169]R. at 575.
[170]R. at 572-73.
[171]Id.
[172]Id.
[173]R. at 610.
[174]R. at 578.
[175]Id.
[176]R. at 578-79.
[177]R. at 579.
[178]Id.
[179]R. at 579-580.
[180]Id.
[181]R. at 580.

stated that she "sometimes" drives and is able to turn her head to look for oncoming traffic.[182] However, Delgado testified that she drives only once per week.[183]

Delgado also attends church services once per week, which last thirty minutes.[184]  To get to the services, Delgado testified that she walks two blocks, but after church gets a ride home because she "cannot do [the walk] again."[185]  While at church she is able to sit in the pew, and she stands and sits periodically throughout the service, as is customary in church services.[186]

Along with testimony that she had back and shoulder pain that made it difficult for her to stand and sit for prolonged periods of time and lift her left arm over her head, Delgado testified that she has significant pain in her right hand, which is her dominant hand.[187]  She stated that she has had the pain for about three years and that the hand swells and becomes painful four or five times per year, each occurrence lasting about eight days.[188]  During these instances, she is unable to cook and she cannot pick up books, magazines, or a glass of water with her right hand.[189]  She stated that to help cope with the pain, she takes Tylenol and is proscribed Flexeril.[190]  Flexeril is "[t]he trademark name of medicinal tablets used for muscle spasm."[191]  Also, to help with the swelling, a doctor gave her a bandage.[192]

---

[182]*Id.*
[183]*Id.*
[184]R. at 584-85.
[185]R. at 585.
[186]R. at 585-86.
[187]R. at 568, 581-82, 587.
[188]R. at 581-82.
[189]R. at 482.
[190]R. at 582-83.
[191]J.E. Schmidt, 2-F Attorneys' Dictionary of Medicine at F-45802(Matthew Bender & Co.2009).
[192]R. at 582.

The ME was then called to testify.[193]  The ME testified that the medical records showed an old spinous process fracture - or crack - at the fifth vertebrae.[194]  The ME noted that while Dr. Kassir stated that there was a fracture at the sixth and seventh vertebrae, nothing in the record supported this finding and that perhaps Dr. Kassir's report was simply erroneous in this respect.[195]  The ME further testified that x-ray results from April 2005 showed that "there was some loss of cervical spine curvature...indicating that there was some paraspinal muscle spasm."[196]  The ME also identified that Dr. Chen's records showed "extensive weakness in the left upper extremities" as well as sensory loss.[197]  However, these findings were "not confirmed on any other examination."[198] Further, this finding was inconsistent with neurological findings made at Centro Medicos just following  Delgado's injury and by Dr. Simkin, the consultative neurological specialist.[199] Therefore, the ME concluded that "the only anatomic pathology that [was] present [was] the old spinous process with paraspinal spasm...."[200]  According to the ME, these anatomical findings would cause "no persistent significant functional limitation" in Delgado.[201]   In terms of the work Delgado could complete, the ME concluded that Delgado was capable of completing medium or even heavy work, "from the information we have available."[202]

---

[193]R. at 591.
[194]R. at 592.
[195]R. at 604.
[196]*Id.*
[197]R. at 592-94.
[198]R. at 595.
[199]*Id.*
[200]*Id.*
[201]R. at 595-96.
[202]R. at 600.

The ALJ questioned the ME further on Dr. Chen's findings.[203] Specifically, the ALJ sought explanation regarding Dr. Chen's observation that Delgado's "grip strength was four plus out of five due to pain, and her dexterity was slightly decreased secondary to pain."[204] The ME explained that four plus out of five is considered significant "because it would preclude heavy exertional demands."[205] However, the ME stated that there was no medical basis to conclude that Delgado was incapable of doing bilateral work with her hands.[206] The ME pointed to the EMG test performed in March 2006 to support his conclusion.[207] The ME added that, "there's no evidence of any underlying inflammatory disorder."[208] There was also insufficient medical evidence to establish that Delgado had "carpal tunnel swelling in her right hand."[209] The ME also discussed Dr. Simkin's completion of the Tinel's sign test.[210] The ME explained that this test is used to "indicate irritation of the median nerves and can be suspicious of possible carpal tunnel syndrome."[211] According to the ME, the Tinel's sign performed on Delgado produced positive bilateral results.[212] The ME stated that such results, "raises the possibility of carpal tunnel syndrome for future exploration. However...it isn't a stand alone sign of nerve compression."[213]

When asked by Delgado's attorney, the ME stated that Delgado's subjective complaints of pain were inconsistent with the physical findings in the record.[214] However, the ME conceded "that

---

[203]R. at 596.
[204]R. at 596-97.
[205]R. at 597.
[206]Id.
[207]Id.
[208]Id.
[209]Id..
[210]R. at 598.
[211]Id.
[212]Id.
[213]Id.
[214]R. at 601.

the record is replete with...subjective complaints of pain."[215] Delgado's attorney then raised the

finding from the MRI dated September 19, 2005, which indicated that there was "a tiny disc

protrusion" at the third and fourth vertebrae.[216] The ME, however, stated that such a deformity would

"usually not" cause pain.[217]

Finally, vocational expert Thomas Dunleavy ("VE") testified.[218] After asking Delgado a few

questions about her past work, the VE classified each of Delgado's past jobs.[219] The VE stated that

Delgado had worked as an assembler, a machine operator, a teacher's assistant, and a cashier.[220] All

of these jobs, according to the VE, had "light" exertional requirements and were "unskilled" jobs.[221]

However, the VE seemed to suggest that the teaching assistant job may be considered "semi-

skilled."[222]

The ALJ then gave the VE several hypothetical individuals, and asked the VE to opine on

what work, if any, this hypothetical person could complete. The ALJ's first hypothetical individual

was forty-five to forty-eight years old and could lift twenty-five pounds frequently and fifty pounds

occasionally.[223] This hypothetical individual could also stand six hours in an eight hour work day

and sit six hours in an eight hour work day.[224] Based on that hypothetical person, the VE stated that

such a person would be able to return to all the past work that Delgado had completed in her past.[225]

---

[215]R. at 603.
[216]R. at 602.
[217]Id.
[218]R. at 606.
[219]R. at 607-610
[220]R. at 610-12.
[221]R. at 610-11.
[222]Id.
[223]R. at 612-13.
[224]Id.
[225]R. at 613.

The second hypothetical individual was similar to the first, but this person could lift only ten pounds frequently and only twenty pounds occasionally.[226] Like the first individual, she could stand six hours in an eight hour work day and sit six hours in an eight hour work day.[227] Again, the VE stated that such a person could do all of Delgado's past work.[228]

The third hypothetical was similar to the second, except "the person had to have sit/stand option every hour in place."[229] To this hypothetical, the VE stated that the only job from Delgado's past that could be completed would be the machine operator job.[230] The VE testified that she could not complete any of her other past jobs with such a sit/stand requirement.[231]

## III.    ALJ's Decision

In her June 27, 2008 decision, ALJ Parkhurst determined that Delgado was not disabled as defined in the Social Security Act and, therefore, was not entitled to any DIB.[232] In reaching this conclusion, the ALJ followed the five-step evaluation process outlined in the Social Security Act regulations (the "regulations").[233] Under the regulations, the ALJ must consider: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is

---

[226]R. at 613-14.
[227]R. at 614.
[228]*Id.*
[229]*Id.*
[230]*Id.*
[231]*Id.*
[232]R. at 24-36.
[233]R. at 25; See 20 C.F.R. § 404.1520.

unable to perform any other work existing in significant numbers in the national economy.[234]   A

finding of disability requires an affirmative answer at either step three or step five, while a negative

answer at any step other than step three precludes a finding of disability.[235]

After explaining the applicable law, ALJ Parkhurst began the five step evaluation process.

At step one, the ALJ found that Delgado had not engaged in substantial gainful activity since

January 1, 2005, the amended onset date.[236]   At step two, the ALJ determined that Delgado's back

and neck pain and her obesity were severe impairments.[237]   Although the ALJ determined that the

disorders were severe, she found that "they are not so limiting as to preclude work."[238] The ALJ went

on to say that the impairments could be deemed non-severe, but the ALJ gave Delgado "some

benefit of doubt in saying that they cause more than a minimal limitation."[239]   The ALJ based this

conclusion on the ME's conclusions that Delgado can perform medium exertional work "and

certainly light exertional work."[240]

The ALJ also discussed the other alleged impairments and her reasoning for not finding them

to be severe impairments. The ALJ concluded that Delgado's stomach ulcers were a non-severe

impairment because "there is little evidence of this in the record" and it never resulted in overnight

hospitalization or required a transfusion.[241]   As for the rotator cuff tear that Dr.  Kassir had

diagnosed, the ALJ also concluded that this was a non-severe limitation.[242]   The ALJ reached this

---

[234]20 C.F.R. § 404.1520(a)(4)(i)-(v).
[235]*Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir.1992).
[236]R. at 26.
[237]*Id.*
[238]*Id.*
[239]*Id.*
[240]*Id.*
[241]R. at 26-27.
[242]R. at 27.

conclusion because Dr. Kassir did not base this diagnosis on an imaging exam or other diagnostic study.[243] "Furthermore, no diagnostic study indicates that the claimant has a rotator cuff tear and the available studies in the record, in fact, suggest otherwise."[244] The ALJ also noted that no other medical professionals made this diagnosis.[245] As for carpal tunnel syndrome, the ALJ also found this to be non-severe because Dr. Simkin stated only that Delgado "might possibly" have carpal tunnel syndrome.[246] Also relevant to Delgado's alleged carpal tunnel syndrome was that Dr. Simkin did not make a definitive diagnosis related to this condition, and the EMG study suggested carpal tunnel syndrome was not present.[247]

ALJ Parkhurst then provided some factual background. She discussed Delgado's slip and fall outside her work.[248] She also explained Delgado's visits with Dr. Perez, the chiropractor at Centros Medicos, and Dr. Segura's initial examination, where Dr. Segura found that Delgado had post-traumatic lumbar syndrome and possible right lumbar radiculopathy.[249] The ALJ stated, however, that at a follow-up visit Dr. Segura "noted that the claimant was much better and had only occasional low back pain and minimal leg symptoms."[250] Additionally, the ALJ emphasized that Dr. Perez reported that Delgado could return to work, with light duty work restrictions.[251]

The ALJ then discussed physical therapist Maldonado's report dated May 21, 2003, where he noted that Delgado had returned to work, had only occasional soreness in her lower back, and had

[243]R. at 27.
[244]Id.
[245]Id.
[246]Id.
[247]Id.
[248]Id.
[249]Id.
[250]Id.
[251]R. at 27-28.

achieved all physical therapy goals.[252]  ALJ Parkhust discussed Delgado's resulting $10,000 workers

compensation claim and the report completed by Dr. Perez, which permitted Delgado to return to

work on June 30, 2003.[253]  The ALJ also commented on the x-ray report dated April 25, 2005, which

was normal except for decreased cervical lordosis.[254]

The ALJ then discussed the examination and opinion completed by Dr. Chen at great

length.[255]  The ALJ highlighted Dr. Chen's conclusions that Delgado had chronic neck pain likely

due to muscle spasm and possible nerve root impingement, but she noted Dr. Chen's finding that

the examination did not reveal classic nerve root impingement distribution.[256]  The ALJ also

discussed the September 19, 2005 MRI, revealing a deformity of the spinous process at the fifth

vertebrae.[257]  The ALJ stressed, however, that the MRI showed no evidence of marrow edema, soft

tissue edema or subluxation.[258]  The ALJ also stated that the MRI showed no central canal stenosis

or evidence of cord compression.[259]  ALJ Parkhust also discussed the EMG test and its largely

normal results.[260]

The ALJ then discussed Delgado's return to physical therapy at Stroger Hospital in August

and September of 2006.[261]  The ALJ noted that in the physical therapy questionnaire Delgado stated

that she was unemployed, but that the unemployment was not related to her medical condition.[262]

---

[252]R. at 28.
[253]*Id.*
[254]*Id.*
[255]R. at 28-30.
[256]R. at 29.
[257]R. at 30.
[258]*Id.*
[259]*Id.*
[260]*Id.*
[261]*Id.*
[262]*Id.*

The ALJ also stated that Delgado reported that she had no problems with housework, grooming, bathing, dressing, walking, stairs, lifting, or sleeping.[263]

The ALJ next discussed the evaluation and opinion by Dr. Simkin in detail.[264] Of significance, ALJ Parkhurst noted that "Dr. Simkin's evaluation revealed that the claimant had no cervical or lumbar paraspinal muscle spasm and that muscle stretch reflexes were equal."[265] The ALJ also acknowledged the positive bilateral Tinel's sign test, which could indicate carpal tunnel syndrome.[266]

The ALJ then discussed the administrative hearing.[267] She first discussed Delgado's testimony and focused on Delgado's claim that she could not return to work.[268] The ALJ noted that Delgado stated that she was unable to work because she could not hold her body up.[269] The ALJ stated that Delgado "impl[ied] that she was physically incapable of working."[270] ALJ Parkhurst explained that according to Delgado, the only medication she currently takes is over the counter pain medication, such as Tylenol.[271] However, the ALJ acknowledged Delgado's fairly sedentary daily activities that Delgado had described in her testimony.[272] The ALJ also noted Delgado's testimony regarding the swelling of her right hand and that it makes it impossible to cook or pick up magazines.[273]

---

[263]*Id.*
[264]R. at 30-31.
[265]R. at 31.
[266]*Id.*
[267]R. at 31-32.
[268]R. at 31.
[269]*Id.*
[270]*Id.*
[271]*Id.*
[272]*Id.*
[273]R. at 32.

As for the ME's testimony, the ALJ noted the ME's specialties in Internal Medicine and Neurology.[274] The ALJ emphasized that according to the ME, "objective studies did not provide a medical basis for the claimant's alleged limitations."[275] The ALJ stated that the ME relied on x-ray results and the EMG study to reach this conclusion.[276] The ALJ also stated that the ME "noted that during the initial consultative examination, Dr. Chen identified some extensive left upper extremity weakness and sensory loss, but that these findings were not confirmed by the claimant's own treating physicians or a subsequent consultative exam by Dr. Simkin."[277] The ALJ also noted that the ME testified that Delgado could perform work at the light exertional level and even suggested medium exertional level work was possible.[278]

Moving to step three, the ALJ found that Delgado did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.[279] The ALJ specifically focused on Listings 1.02, Major Dysfunction of a Joint, and 1.04, Disorders of the Spine.[280] According to the ALJ, Listing 1.02 did not apply because, "there was no evidence of involvement of a major peripheral weight-bearing joint resulting in an inability to ambulate effectively. Nor is there evidence of involvement of one major peripheral joint in each upper extremity, resulting in an inability to perform fine and gross

---

[274]*Id.*
[275]*Id.*
[276]*Id.*
[277]*Id.*
[278]*Id.*
[279]R. at 32.
[280]*Id.*

movements effectively...."[281]  As for Listing 1.04, the ALJ stated, "there is no evidence of nerve root compression, or spinal arachnoiditis or lumbar spinal stenosis."[282]

The ALJ next determined Delgado's residual functional capacity ("RFC").[283]  A claimant's RFC represents the work a claimant can perform despite his or her physical or mental limitations.[284] The ALJ found that Delgado had the RFC "to perform the full range of light work as defined by 20 CFR 404.1567(b)."[285]  "Light work" is defined as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."[286]  Furthermore, it requires a "good deal" of walking or standing.[287]  In determining that Delgado could perform "light work," the ALJ noted that the objective evidence, in the form of imaging studies and diagnostic studies, was unremarkable and failed to support her alleged limitations.[288]  The ALJ specifically noted that the evidence did not support her allegation regarding her inability to sit and stand for extended periods of time.[289]

The ALJ also doubted the severity of Delgado's complaints because of inconsistences in the record.[290]  The ALJ stated that at an initial physical therapy evaluation soon after the accident, "she had no problems with housework, grooming, bathing, dressing, walking, stairs, lifting or sleeping."[291]  The ALJ found this inconsistent with her claims that she could not sit or stand for long

---

[281]*Id.*
[282]*Id.*
[283]R. at 33.
[284]20 C.F.R. § 416.945.
[285]R. at 33.
[286]20 C.F.R. 404.1567(b).
[287]*Id.*
[288]R. at 33.
[289]*Id.*
[290]*Id.*
[291]R. at 33-34.

periods of time and her hearing testimony regarding her limited daily activities.[292] The ALJ also noted that Delgado indicated in the physical therapy questionnaire that sitting eased her pain, which was inconsistent with her claim that she could not sit for extended periods.[293] Further, the ALJ noted that Delgado drives and "is able to turn her head around to see traffic, suggesting that the neck problems are not as severe as alleged."[294] The ALJ also doubted Delgado's claim that she did nothing at the insurance business that she had started because she admitted having an office at the business.[295] The ALJ then discredited her allegations of pain because "she reported to more than one source that she takes no medication or only over the counter medication for pain."[296]

The ALJ then weighed the various medical opinion evidence. After discussing Dr. Kassir's opinion, the ALJ ultimately assigned minimal weight to his opinion.[297] The ALJ noted that Dr. Kassir was not a treating physician, saw the claimant only once, and conducted a very basic examination, meaning he was not aided by diagnostic tests or studies.[298] The ALJ noted that Dr. Kassir's opinion was not totally consistent with the ALJ's RFC because Dr. Kassir had found "postural limitations."[299] However, the ALJ discounted this finding because "there [was] no objective diagnostic evidence to support the postural limitations suggested by Dr. Kassir."[300] Further, the ALJ noted that no other doctor had made a diagnosis of a rotator cuff tear and no diagnostic test confirmed a rotator cuff tear.[301] As for Dr. Kassir's conclusion that there was a fracture of the fifth

---

[292]R. at 33-34.
[293]R. at 34.
[294]Id.
[295]Id.
[296]R. at 34.
[297]Id.
[298]Id.
[299]Id.
[300]Id.
[301]Id.

and sixth vertebrae, the ALJ stated, "x-rays and an MRI in the record shows that the claimant [had] a possible history of a vertebrae fracture of the fifth vertebrae but clearly not a fracture of the sixth and seventh vertebrae."[302]

The ALJ also assigned minimal weight to Dr. Simkin's opinion because her opinions were "not supported by the diagnostic evidence contained in the record, and arguably, not by the findings from Dr. Simkin's own examination of [Delgado], which except for trigger tenderness in the cericobrachial area, slightly diminished cervical range of motion, and a positive Tinel sign, was a normal examination."[303]

The ALJ stated that she assigned "significant weight" to the opinion of the ME because "he had an opportunity to review the entire record and hear the entire testimony of the claimant."[304] The ALJ also found it compelling that the ME was a neurology specialist.[305] Finally, the ALJ stated that she assigned minimal weight to state agency medical opinions, which appears to be the opinions of Dr. Frank and Dr. Chen, because the opinions were made early in the process, before all the evidence had been collected.[306]

Having determined Delgado's RFC, the ALJ proceeded to step four to determine whether she could perform any past relevant work.[307] The ALJ concluded that Delgado was "capable of performing past relevant work as an assembler, machine operator, teacher's assistant, and

---

[302]*Id.*
[303]R. at 34-35.
[304]R. at 35.
[305]*Id.*
[306]*Id.*
[307]*Id.*

cashier."[308]  According to the ALJ, such work was not precluded by Delgado's RFC.[309]  In reaching

this conclusion, the ALJ relied heavily on the VE's testimony.[310]  Having concluded that Delgado

could complete past relevant work, the ALJ found that she was not disabled, as defined by the Social

Security Act, since January 1, 2005.[311]


## IV.    Standard of Review

The District Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's

factual determinations are entitled to deference.[312]  The Court will uphold the ALJ's decision if

substantial evidence supports the findings of the decision and if the findings are free from legal

error.[313]  Where reasonable minds differ, it is for the ALJ, not this Court, to make the ultimate

finding as to disability.[314]  However, the ALJ must make an accurate and logical connection from

the evidence to the ultimate conclusion.[315]  While, the ALJ is not required to discuss every piece of

evidence, the ALJ must minimally articulate his reasons for crediting or discrediting evidence of

disability.[316]


## V.    Analysis

Delgado's overarching argument is that the ALJ improperly rejected the opinions of Drs.

Kassir and Simkin, two examining physicians, and erroneously favored the opinion of the ME, a

nonexamining physician.   Additionally, Delgado argues that the opinion of Dr. Chen, another

---

[308]*Id.*
[309]*Id.*
[310]*Id.*
[311]*Id.*
[312]*Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).
[313]42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F. 3d 936, 940 (7th Cir. 2002).
[314]*Cass v. Shalala,* 8 F. 3d 552, 555 (7th Cir. 1993).
[315]*Dixon v. Massanori*, 270 F. 3d 1171, 1176 (7th Cir. 2001).
[316]*Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

examining physician, was not inconsistent with the opinions of Drs. Kassir and Simkin and, therefore, is an additional reason why the ALJ should have given the opinions of Drs. Kassir and Simkin greater weight. Delgado claims that by failing to weigh the medical opinions appropriately, the ALJ came to the flawed RFC finding that Delgado could complete "light work." According to Delgado, the improper RFC finding led to the incorrect conclusion that Delgado could perform past work. We note that Delgado does not argue with the ALJ's conclusion that an individual capable of "light work" could return to Delgado's past work. Prior to addressing this argument we must first clarify the definition of "light work," as defined in the regulations. Once this is complete, we will discuss the ALJ's treatment of each of the examining physicians' opinions to determine whether the ALJ erred.

## A.    Definition of "Light Work"

We must first clarify the definition of "light work," which the ALJ determined Delgado was capable of completing. Both parties seem confused about how much weight an individual must be able to lift and carry in order to be considered capable of completing "light work." The Commissioner seems to suggest that the claimant need only lift and carry ten and twenty pounds occasionally. However, as we noted *supra*, "light work" is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."[317] The Commissioner's statement that "light work" requires only "occasional" lifting and carrying of weights up to ten pounds is, therefore, incorrect. The regulations are clear that the claimant must be able to "frequently" lift and carry objects weighing up to ten pounds.

---

[317] 20 C.F.R. 404.1567(b).

As for Delgado, she states that a claimant capable of "light work" must be able to lift twenty pounds one-third of the time. To get to this conclusion, that "light work" requires lifting twenty pounds for one-third of the time, Delgado has inserted the word "occasionally" into the definition of "light work." Then she points us to the definition of "occasionally" to support her theory. Social Security Ruling 83-10 defines occasionally as "occurring from very little up to one-third of the time."[318] Delgado's definition of "light work" is also flawed. First, nowhere in the definition of "light work" itself does it state that a claimant must lift twenty pounds "occasionally." Instead, the regulations state only that a claimant must be able to lift *no more than* twenty pounds. Second, occasionally is not defined as meaning one-third of the time, but it is instead defined in a range from very little to one-third. Therefore, we restate for clarity that "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."[319]

## B.    Weighing of the Various Physicians' opinions

Turning to Delgado's main argument, Delgado contends that the ALJ improperly concluded that Delgado could complete "light work." Delgado avers that the ALJ improperly rejected the opinions of the examining physicians, Drs. Kassir and Simkin, in favor of the opinion of the non-examining ME in reaching this erroneous conclusion. Delgado states that if the ALJ weighed these opinions appropriately, then she would not have concluded that Delgado could complete "light work." Delgado then argues that an additional reason to give these opinions greater weight is that a third examining physician, Dr. Chen, provided an opinion that was "not inconsistent" with the opinions of Drs. Kassir and Simkin.

---

[318]SSR 83-10.
[319]20 C.F.R. 404.1567(b).

Opinions from medical professionals are assigned weight based on a treatment relationship hierarchy. Most favored in the hierarchy are treating physicians.[320] In fact, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."[321] Treating physicians' opinions are entitled to greater weight "because of their greater familiarity with the claimant's conditions and circumstances."[322]

Second in the hierarchy are examining physicians. The opinion of a source that has examined the claimant will be given more weight than an opinion of a source that has not examined the claimant, and an ALJ cannot reject the opinion of an examining physician solely on the basis of a contradictory opinion of a non-examining physician.[323] Instead, to reject an examining physician's opinion the ALJ must cite to substantial evidence in the record.[324]

At the bottom of the hierarchy are nonexamining physicians. Whether weight will be given to a nonexamining physician will depend on the degree to which the physician provided supporting explanations for his or her opinion.[325] The ALJ should also evaluate the extent to which the nonexamining opinions consider all of the pertinent evidence, such as opinions from treating and examining physicians.[326]

---

[320]20 C.F.R. § 416.927(d).
[321]*Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *see also* 20 C.F.R. § 416.927(d).
[322]*Gudgel,* 345 F.3d 467 at 470(*citing Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)); *see also* 20 C.F.R. § 416.927(d).
[323]*Gudgel*, 345 F. 3d at 470; *see also* 20 C.F.R. § 416.927(d).
[324]*Id.*
[325]20 C.F.R. § 404.1527(d)(3).
[326]*Id.*

Whether crediting or discrediting evidence of disability, the ALJ must "minimally articulate" his reasons for doing so.[327]  When deciding whether to accept or reject evidence of disability, important factors for the ALJ to consider are how frequently the physician saw the patient, whether the physician is a specialist on the relevant medical issues, the sufficiency of the physician's explanation of his or her opinion, and the consistency of the opinion with the record as a whole.[328]

We note that there was some apparent disagreement among the parties as to whether this Court applies the substantial evidence standard or the *de novo* standard during our review of this issue. Delgado argues that the Commissioner is incorrect when he argues that we are to examine only whether the ALJ's opinion is supported by substantial evidence.  Instead, Delgado contends we are to review Delgado's argument under the *de novo* standard because she has argued that the ALJ made two legal errors.  First, Delgado states that the ALJ's decision did not follow the proper legal requirements in weighing the opinions of the various doctors.  Delgado phrases her argument as follows: "whether the ALJ acted correctly in rejecting the opinions of three examining physicians...in favor of the single opinion of the non-examining doctor who testified at the hearing."[329]  As we have stated, the regulations prohibit an ALJ from rejecting an examining physician solely on the basis of a nonexamining physician.[330]  However, the ALJ's decision to reject an examining physician's opinion will be upheld so long as the ALJ cites to substantial evidence in the record.[331]  Therefore,  in this case, where Delgado is arguing that the opinions of examining

---

[327]*Clifford,* 227 F.3d at 871.
[328]20 C.F.R. §§ 404.1527(d)(1)-(6).
[329]Delgado's Reply at 2.
[330]*Gudgel*, 345 F. 3d at 470; *see also* 20 C.F.R. § 416.927(d).
[331]*Id.*

physicians were improperly rejected, we will uphold the ALJ's decision to reject opinions of examining physicians so long as the ALJ cited to substantial evidence in the record.

Second, Delgado contends that the *de novo* standard applies because she is arguing that the evidence does not show that Delgado's RFC corresponds to the legal requirements of "light work." But what work activities an individual can complete is inherently a factual determination and, therefore, not entitled to *de novo* review. We do not think that Delgado is arguing that the ALJ misinterpreted the definition of "light work," in which case *de novo* review would be appropriate. In fact, we have already discussed Delgado's apparent misunderstanding of the definition of "light work."

*1. Dr. Kassir*

We now turn to the opinions of the examining physicians, which Delgado claims were inappropriately rejected. With respect to Dr. Kassir, Delgado contends that Dr. Kassir's finding "suggests" that Delgado was unable to complete "light work." Specifically, Delgado argues that Dr. Kassir's conclusion regarding the amount of weight Delgado could lift and carry is contrary to a finding that she could complete "light work." As we have discussed, Delgado premises this argument on her misconstrued definition of "light work," which is that an individual capable of "light work" must be able to lift twenty pounds one-third of the time.

First, we do not agree that Dr. Kassir made any finding regarding Delgado's ability to lift up to twenty pounds whatsoever. In his assessment, Dr. Kassir circled "up to 10 LB" with regard to "repeated weightlifting during an 8 hour day, 5 days per week."[332] While it is true, as Delgado

---

[332]R. at 437.

states, that "[i]t cannot properly be assumed that Dr. Kassir's responses would indicate an ability to go further and lift up to 20 pounds for one-third of a normal workday,"[333] it also cannot be assumed that Dr. Kassir was of the opinion that Delgado could *never* lift up to twenty pounds. All we can conclude from Dr. Kassir's opinion, with regard to Delgado's ability to lift weights, is that she could lift weights of up to ten pounds repeatedly, which is entirely consistent with the "light work" definition.

Second, as discussed, the definition of "light work" requires a claimant to lift no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Therefore, even if Dr. Kassir explicitly stated that Delgado could not lift twenty pounds one-third of the time, his opinion would be consistent with a finding that she could do the full range of "light work." The definition of "light work" simply does not require the claimant to lift twenty pounds for one-third of the time.

Third, Dr. Kassir's opinion was also consistent with the RFC in other respects. Indeed, the ALJ stated, "Dr. Kassir's functional capacity assessment is not completely inconsistent with [the RFC]."[334] With regard to Delgado's ability to walk, stand, and sit, which Delgado repeatedly claimed that she was incapable of doing for extended periods of time, Dr. Kassir opined that Delgado could walk, stand, and sit at "full capacity."[335] And this is consistent with "light work," which requires a "good deal" of walking and standing.[336]

---

[333]Delgado's Reply at 4.
[334]R. at 35.
[335]R. at 437.
[336]20 C.F.R. 404.1567(b).

We acknowledge that the ALJ found Dr. Kassir's opinion to be inconsistent with the RFC in other respects. The ALJ, however, cited to substantial evidence in the record and explained her reasoning for assigning Dr. Kassir's opinion less weight. Ultimately, where reasonable minds differ as to whether a claimant is disabled because of conflicting evidence, the determination is to be made by the ALJ, not this Court.[337] The ALJ stated that Dr. Kassir's opinion regarding postural limitations was not supported by diagnostic evidence and that Dr. Kassir saw the patient only once.[338] The ALJ also stated that Dr. Kassir's finding of a rotator cuff tear was not supported by diagnostic tests and was not diagnosed by any other physician.[339] In relying on the ME's opinion, which contradicted Dr. Kassir's opinion with respect to the postural limitations and the rotator cuff tear diagnosis, the ALJ justified her analysis noting that the ME was a neurologist, observed Delgado at the hearing, and examined all the medical records, including diagnostic tests.[340] We also should emphasize that, contrary to Delgado's argument, the ALJ did not rely solely on the opinion of the ME in assigning Dr. Kassir's opinion minimal weight. The ME's opinion was simply part of the ALJ's justification. Finally, although Delgado does not argue otherwise, we think that it is important to note that as an examining physician, as opposed to a treating physician, Dr. Kassir's opinion is not entitled to controlling weight.[341] Considering this entire analysis, we conclude that the ALJ minimally articulated her reasoning for assigning Dr. Kassir's opinion minimal weight.

*2. Dr. Simkin*

---

[337] *Cass,* 8 F. 3d at 555.
[338] R. at 34.
[339] *Id.*
[340] R. at 35.
[341] *Gudgel,* 345 F.3d at 470; *see also* 20 C.F.R. § 416.927(d).

Next, Delgado argues that the ALJ improperly rejected Dr. Simkin's opinion because it was also inconsistent with the determination that Delgado could complete "light work." Specifically, Dr. Simkin indicated that Delgado could lift weights of up to ten and twenty pounds only "occasionally."[342] This conclusion contradicts the ALJ's RFC determination of "light work" because "light work" requires "frequent" lifting and carrying of up to ten pounds.[343] Dr. Simkin also opined that in an eight hour work day that Delgado could sit for six hours, stand for four hours, and walk for two hours.[344] Delgado argues that this is inconsistent with the RFC for "light work" because "light work" requires a "good deal" of walking and standing, which is defined more specifically as "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."[345]

It is not clear that Dr. Simkin's opinion regarding Delgado's ability to stand and walk is inconsistent with the definition of "light work" because "[m]any unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk."[346] Therefore, Dr. Simkin's opinion that Delgado could stand for four hours and walk for two hours in an eight hour day appears consistent with the requirement that she be able to stand or walk, off and on, for six hours.

But the focus of our analysis must remain on whether the ALJ provided the necessary minimal articulation for assigning Dr. Simkin's opinion minimal weight, and whether this

---

[342]R. at 513.
[343]20 C.F.R. 404.1567(b).
[344]R. at 514.
[345]SSR 83-10.
[346]*Id.*

articulation is supported by substantial evidence in the record. We repeat that our review goes no further than this analysis. We are not permitted to reweigh the facts.[347]

In assigning Dr. Simkin's opinion less weight, the ALJ concluded that evidence did not support Dr. Simkin's opinion. This is relevant, as the regulations state that, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."[348] Conversely, an ALJ is permitted to assign less weight to medical opinions that are not supported by clinical support.[349] In this case, the ALJ found Dr. Simkin's opinion was not supported by relevant evidence. Specifically, the ALJ observed that Dr. Simkin's observations were mostly normal, with the exception of "trigger tenderness in the cericobrachial area, slightly diminished cervical range of motion, and a positive Tinel sign."[350] Furthermore, the ALJ noted that Dr. Simkin's opinion was inconsistent with the diagnostic evidence contained throughout the record, which the Court notes included two MRIs, X-rays, and the EMG test.[351] Therefore, we find no error with the ALJ's decision to assign Dr. Simkin's opinion less weight because this decision was supported by substantial evidence in the record.

*3. Dr. Chen*

Delgado also points to Dr. Chen's opinion and argues that, although Dr. Chen never identified any functional limitations, her conclusions were "not inconsistent" with the findings of Drs. Kassir and Simkin. Delgado does not make the argument that Dr. Chen's opinion is

---

[347]*Cass,* 8 F. 3d at 555.
[348]20 C.F.R. § 416.927(d)(3).
[349]*See Knight v. Chater,* 55 F.3d 309, 314 (7th Cir. 1995)(stating, "[t]he ALJ was allowed to conclude that [treatment notes] do not provide adequate clinical support for [the doctor's] opinion....").
[350]R. at 34-35.
[351]*Id.*

inconsistent with the RFC finding. Instead, Delgado appears to be arguing that Dr. Chen's opinion is an additional reason why the opinions of Drs. Kassir and Simkin should have been given more weight. Essentially, Delgado is asking the Court to find the opinions of Drs. Kassir and Simkin more persuasive in light of Dr. Chen's opinion. We reiterate, however, that the Court cannot reweigh the evidence.[352] Yet it appears that Delgado is asking us to do just that. We have already determined that the ALJ cited to substantial evidence in assigning less weight to the opinions of Drs. Kassir and Simkin. Our analysis ends there. Dr. Chen's opinion, therefore, even if it is consistent with the opinions of Drs. Kassir and Simkin, would not alter our limited analysis of the ALJ's treatment of the opinions of Drs. Kassir and Simkin.

It should also be noted, however, that the ALJ stated, when referencing the ME's opinion, that Dr. Chen's "findings were not confirmed by the claimant's own treating physicians or a subsequent consultative exam by Dr. Simkin."[353] It appears, then, that Dr. Chen's opinion was inconsistent with Dr. Simkin's opinion according to the ME. And, as we have discussed, the ALJ ultimately provided sufficient reasons for giving the ME's opinion significant weight, including the ME's speciality in neurology and the fact that the ME had the opportunity to review all of the medical records. Therefore, Dr. Chen's opinion does not provide additional credence to the opinion of Dr. Simkin. And, as stated, even if it did, the ALJ explained in her opinion that she ultimately assigned Dr. Chen's opinion minimal weight because it was rendered early in the disability determination process, before all the relevant evidence had been collected.[354] We, therefore, conclude that Dr. Chen's opinion does not alter our finding that the ALJ provided sufficient

---

[352]*Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).
[353]R. at 32.
[354]R. at 35.

articulation, supported by substantial evidence in the record, for assigning minimal weight to the opinions of Drs. Kassir and Simkin.

**VI.      Conclusion**

For the reasons explained above, Delgado's motion for summary judgment is denied [dkt. 19], and the Commissioner's motion for summary judgment is granted [dkt. 22].   The Commissioner's final decision is, therefore, affirmed.

**IT IS SO ORDERED**.

**ENTERED: June 21, 2011**                 _____

                                            **UNITED STATES MAGISTRATE JUDGE**

                                            **Susan E. Cox**